### THE VONS COMPANIES, INC. Plaintiff,

v.

### FEDERAL INSURANCE COMPANY, Defendant.

No. CV 97–8715 CM(RNBx).

United States District Court, C.D. California.

Aug. 12, 1998.

934

Cary B. Lerman, Munger Tolles & Olson, Los Angeles, CA, for Plaintiff.

David T. DiBiase, Anderson McPharlin & Conners, Los Angeles, CA, for Defendant.

Alex Hofrichter, Miami, FL, for Co-Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MORENO, District Judge.

I.

*INTRODUCTION AND RELEVANT BACKGROUND*

On May 8, 1997, The Vons Companies, Inc. filed this action for declaratory relief and breach of insurance contract against Federal Insurance Company in the United States District Court for the Southern District of Florida. On November 25, 1997, the District Court transferred the case to the Central District of California and assigned it to the Honorable Irving Hill. It was subsequently reassigned to this Court.

The action arises out of Federal's denial of insurance coverage to Vons. In its proof of loss Vons had informed Federal that Vons had suffered or might suffer a "direct loss of money or other property caused by thefts and forgeries by Gene Shirley, an employee of Stanford Trading, Inc., which company provided services to Vons as an independent contractor." Declaration of Carleton R. Burch ("Burch Decl."), Ex. 1, at 55. Stanford worked with another entity, Premium Sales, in the purchase and sale of products in a secondary market in the grocery and health and beauty aid retail business known as "diverting."[1] Vons and Stanford both learned at about the same time in November 1991 that Stanford employee Shirley was taking kickbacks, probably from Premium. Neither Stanford nor Vons knew that Premium Sales was operating a Ponzi scheme as it brought in investors to fund the so-called "funding entities" that facilitated these transactions. They learned enough, however, to compel Vons to insist that Stanford fire Shirley. Vons then terminated its relationship with Stanford.

When the Premium Sales enterprise collapsed, two lawsuits were filed in 1993— one brought by the receiver and one by the investors. Although not one of the initial "grocer defendants," Vons was amended in. Vons ultimately agreed in 1996 to pay $10 million to settle the two actions. It then asked Federal, its longtime insurer on employee fidelity policies, to fund the settlement (less the $1 million deductible). Federal, however, denied coverage.

1. As Vons explains the origins of its difficulties: Many grocers engage in a legitimate practice called "diverting." Manufacturers often sell merchandise at varying prices in different regions of the country. Grocers "can occasionally purchase products from a retailer in another part of the country at a price lower than the grocer would have to pay for that product wholesale.... Diverters will purchase goods at off-market prices in one location and sell them to retailers at another location for profit." Memorandum of Points and Authorities in Support of Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Vons Summ. J. Mem."), 3.

Premium Sales held itself out as a diverter and sought investors to effectuate specific buy/sell transactions through companies, often partnerships, called "funding entities."

Premium promised investors returns of 1 percent per week on their investments. A good part of Premium's business was fraudulent, and it engaged in a Ponzi scheme, paying earlier investors with the funds obtained from newer investors.

Vons used an independent contractor, Stanford Trading, Inc., to help it participate in obtaining merchandise through diverting. One of Stanford's employees, Gene Shirley, who was working on Vons' premises, was discovered to be involved in Premium's illegal schemes and to be taking kickbacks. Stanford fired Shirley in late 1991, Vons terminated its relationship with Stanford in early 1992. Both Vons and Stanford investigated Shirley's activities but neither one found any dollar loss to Vons. Vons Summ. J. Mem., 3–6.

Vons and Federal now cross-move for summary judgment or, in the alternative, partial summary judgment. Upon full consideration of the parties' admissible evidence and arguments, the Court enters the following memorandum and order.

## II.

### RELEVANT FACTS

#### A. The Polic(ies)

The following facts are derived from Vons' Statement of Genuine Issues and Additional Disputed and Undisputed Facts in Opposition to Federal Insurance Company's Statement of Uncontroverted Facts and Conclusions of Law ("Vons–Fed. UF No. __"), unless otherwise indicated.

Federal executed and delivered to Vons as insured the following policies for the following periods:

| Type of Policy | Policy No. | Coverage Period |
| --- | --- | --- |
| Crime Insurance Policy | 8103–18–91 E | 4/1/90–4/1/92 |
| Crime Insurance Policy | 8103–18–91 F | 4/1/92–4/1/93 |
| Executive Protection w/Crime Coverage Section | 8103–18–91 I | 4/1/95–4/1/96 |
| Executive Protection w/Crime Coverage Section | [not provided] | 4/1/96–4/1/97 |

Vons–Fed. UF Nos. 1–4. Vons asserted its claim under Insuring Clauses 1 and 4 contained within both the Crime Insurance Policy and the Executive Protection Policy. Vons–Fed. UF No. 5.

Insuring Clause 1 provides "[t]he Company shall be liable for direct losses of Money, Securities or other property caused by Theft or Forgery by any Employee of any Insured acting alone or in collusion with others." Vons–Fed. UF No. 6. In the 1995–96 and 1996–97 Executive Protection Policies, "employee" is defined:

> either in the singular or plural, means one or more persons while in the regular service of any Insured in the ordinary course of the Insured's business during the term of this coverage section and whom any Insured compensates by sala-

ry, wages and/or commissions and has the right to govern and direct in the performance of such service; and shall also mean:

(A) any noncompensated officer of any Insured,

(B) any ex-Employee for a period not exceeding thirty days following termination of such person's services,

(C) any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee,

(D) any individual or individuals assigned to perform Employee duties for any Insured, within the Insured's Premises, by any agency furnishing temporary personnel on a contingent or part-time basis: provided, however, that this coverage section does not cover any loss caused by any such individual if such loss is also covered by any insurance or suretyship held by the agency furnishing such temporary personnel to the Insured, and

(E) any one or more of the natural persons while in the service of any Employee Benefit Plan (included as Insured herein) as fiduciary, trustee, officer, or employee and any other natural person required to be bonded by Title I of the Employee Retirement Income Security Act of 1974, as amended,

(F) Independent Contractors and leased employees.

The 1991–92 Crime Insurance policy defined "employee" the same way, except that it did not include section (F). Vons–Fed. No. 7.[2]

The policies contain the following exclusion from coverage under Insuring Clause 1:

7. Coverage under Insuring Clause 1 of this coverage section does not apply to:

factor, commission merchant, consignee, contractor or other agent or representative of the same general character." Vons–Fed. UF No. 9.

---

**2.** The Crime Insurance Policy Form (1991–92) contained the following exclusion: "2.2 Coverage under Insuring Clause 1 does not apply to: (C) Loss caused by any broker,

(C) loss caused by an Employee if an elected or appointed officer of the Insured possessed at any time knowledge of any act or acts of Theft, fraud or dishonesty committed by such Employee:

(1) in the service of the Insured or otherwise during the term of employment by the Insured, or (2) prior to employment by the Insured provided that such conduct involved Money, Securities or other property valued at $25,000 or more.

The 1991–92 policy contained the same exclusion, numbered 2.2; the amount referenced was $10,000. Vons–Fed. No. 11.

Insuring Clause 4 in the Crime Insurance Policy Form and the Executive Protection Policy Form provide that Federal shall be liable

for direct losses caused by forgery or alteration of, on or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a sum certain in money, made or drawn by, or drawn upon [Vons] or made or drawn by one acting as agent of [Vons], or purporting to have been made or drawn as set forth above, including:

(A) any check or draft made in the name of [Vons] payable to a fictitious payee and endorsed in the name of the fictitious payee;

(B) any check or draft procured in a face to face transaction with [Vons] or with one acting as agent of [Vons] by anyone impersonating another and made or drawn payable to the one impersonated and endorsed by anyone other than the one impersonated; and

(C) any payroll check, payroll draft or payroll order made or drawn by [Vons] payable to bearer as well as to a named payee and endorsed by anyone other than the named payee without authority of the payee.

Vons–Fed. No. 10.[3]

The Crime Insurance Policy and Executive Protection Policy forms provide that "[l]egal proceedings for recovery of any loss hereunder shall not be brought after the expiration of two years from the discovery of such loss...." Vons–Fed. UF No. 12.

### B. *The Rest of the Story*

The following facts are based on the parties' separate statements, unless otherwise indicated.

Federal is one of the insurance companies operating under the name of Chubb Group of Insurance. Response to Separate Statement of Genuine Issues of Federal Insurance Company in Opposition to Motion for Summary Judgment or Partial Summary Judgment of Plaintiff The Vons Companies, Inc. ("Vons UF No. __"), No. 2.[4] Federal has provided Vons with crime coverage from at least 1986 through 1996. Vons UF No. 83. Federal issued Execu-

---

**3.** Insuring Clause 4 continues:

For purposes of this Insuring Clause mechanically reproduced facsimile signatures shall be treated the same as handwritten signatures.

If [Vons] or [Vons'] bank of deposit, at the request of [Vons], shall refuse to pay any of the foregoing instruments made or drawn as set forth above alleging that the instruments are forged or altered, and this refusal shall result in suit being brought against [Vons] or bank to enforce payment and [Federal] shall give its written consent to the defense of the suit, then any reasonable attorneys' fees, court costs or similar legal expenses incurred and paid by [Vons] or bank in defense shall be considered a loss under this Insuring Clause, and the liability of [Federal] for such loss shall be in addition to any other liability under this Insuring Clause.

If, at [Vons'] request, the Company waives any rights it may have against the bank upon which the instrument was drawn, [Vons] and the bank shall assign to [Federal] all of their rights against any other person, firm or corporation.

Burch Decl., Ex. 1, at 28.

**4.** The other Chubb companies that issue fidelity or crime coverage are Northwest Pacific, Great Northern, and Chubb Custom Market. Vons UF No. 2.

tive Protection Policy No. 8103–18–91–I to Vons as insured on or about April 13, 1995 for the policy period April 1, 1995 to April 1, 1996. Vons UF No. 1. In addition to the Executive Protection Policy that Federal sold to Vons, Federal also sells the Financial Institution Bond Standard Form 24. Vons UF No. 3. Vons contends that the crime insurance policy that Chubb · sold Vons provides much broader coverage than Financial Institutions Bond Standard Form 24. Vons UF No. 84.

Because of regional differences in merchandise prices sold by manufacturers, grocers can purchase products from a retailer in another part of the country at a price lower than the grocer would have to pay for the product wholesale. Vons UF No. 11. "Diverting" is a legitimate practice whereby grocery and health and beauty aid products are purchased at off-market prices in one location and sold to retailers in another location for profit. Vons UF No. 12.

Prior to 1986, Vons had occasionally engaged in transactions on the secondary market using its own buyers, who were full-time employees. Vons UF No. 37. It did not have a formal diverting program. *Id.* Vons contends that in 1986, a company called FoxMeyer Trading Corp. agreed to supply personnel to work exclusively on Vons' premises to assist Vons in buying and selling products. Federal disputes this characterization of the agreement: "FoxMeyer/Stanford and VONS entered into a complex business relationship." Vons UF No. 40. FoxMeyer Trading is the predecessor of Stanford Trading Corp. Vons UF No. 41. Allan Birholtz was Stanford's president. Vons UF No. 42.

Vons contends that it intended the arrangement with Stanford to be temporary, which Federal disputes. Vons UF No. 43. Vons intended to replace the Stanford personnel after it was able to train its own permanent employees and after it was

demonstrated that having full-time diverter buyers could save Vons money. Vons UF No. 44. Federal argues that Vons had no such plan and even considered hiring Stanford's employees Gene Shirley and Gary Prince away from Stanford Trading. *Id.*

Stanford Trading placed two clerical workers and two secondary market buyers on Vons' premises, including Eugene Shirley. Vons UF Nos. 45 and 46. Shirley worked exclusively for Vons to implement the contract between Stanford and Vons, on Vons' premises, from December 1987 to November 1991. Vons UF No. 47. Vons contends that he was required to obtain the approval of a full-time, permanent Vons buyer for each secondary market transaction he wanted to consummate for Vons. Vons UF No. 48. Federal disputes this fact. Shirley had full access to Vons' proprietary computer program showing Vons' purchasing needs and pricing information. Vons UF No. 49.[5] He did not review proposed transactions with Stanford Trading or obtain their approval before completing a buy or sell for Vons. Vons UF No. 50. His job was to secure the best possible prices for Vons. Vons UF No. 51.

Premium Sales was a diverter. Vons UF No. 13. "To divert goods, [Premium] required ready access to cash. Suppliers demanded that funds be wired before they would release the product being purchased. The ultimate buyers of the goods diverted by Premium, however, would not pay cash, but rather would be given credit terms with payment due some period of time after delivery of the goods." Receiver's Second Amended Ancillary Complaint ¶ 109, attached as Ex. 2 to Corrected Declaration of Kristin S. Escalante in Support of Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Escalante Decl."). From the be-

---

**5.** Federal argues that Stanford employees used a special computer program that Stan- ford developed. Vons UF No. 49.

ginning, Premium borrowed money from individuals to purchase goods and agreed to repay the individuals from the proceeds of the ultimate sales of the goods. *Id.* ¶ 110. It promised investors extraordinary returns of 1 percent per week on funds they invested in Premium Sales. Vons UF No. 14. The company was supposed to use the investors' funds to purchase goods from grocers and then resell goods to other grocers at a profit. Vons UF No. 15. Although the details of the relationship between Premium Sales Corp. and each funding entity varied, the basic premise was that investors would provide funds through the funding entities to effectuate specific buy/sell transactions. Vons UF No. 16. A substantial part of Premium's business was fraudulent. Vons UF No. 17.[6]

Individuals invested through companies, some of which were partnerships, called "funding entities." Vons UF No. 18. Premium Sales created fictitious purchase orders, invoices, and wire transfer instructions in order to convince the funding entities that specific diverting transactions were legitimate. Vons UF No. 19. The fictitious documents were provided to the funding entities prior to their agreement to invest in individual transactions. Vons UF No. 20.[7]

The purchase orders described the goods and listed the quantities, price, and terms by which Premium Sales would purportedly purchase product from a specially identified grocer. Vons UF No. 22. The wiring instructions allegedly set forth instructions from the selling grocer to wire the money for the purchase of the product to the seller's bank account listed on the form. Vons UF No. 23. The false invoice purported to show that Premium Sales had already sold the product to the second grocer at a set price and profit and gave details of the purported resale of the goods to the second grocer. Vons UF No. 25. The funding entities believed these documents represented legitimate transactions. Vons UF No. 26.

Premium Sales told the funding entities they could confirm the legitimacy of each proposed purchase and sale by contacting so-called "confirmers" at the grocers. Vons UF No. 27. The "confirmers," however, were in collusion with Premium Sales. Vons UF No. 28. Premium Sales would send an advance copy of the fictitious documents to the confirmer, who knew he would receive a call from the funding entity. Vons UF No. 29. The confirmer would then tell the funding entity that the transaction was legitimate. Vons UF No. 30. That is, the confirmer at the selling grocer would falsely confirm that the grocer had agreed to sell the item listed on the purchase order at the price indicated. Vons UF No. 31. The confirmer at the purchasing grocer would falsely confirm that the grocer had promised to buy the item listed on the invoice at the price shown. Vons UF No. 32. The funding entities relied on the ability to confirm the transaction in determining whether to fund the transactions. Vons UF No. 33.[8]

---

**6.** As the Receiver alleged in the underlying action, "the Grocery Defendants all engaged in 'real' transactions with the Premium Corporations. The Grocery Defendants all benefitted substantially from the corrupt activities of the Confirmer Defendants and the Insider Defendants because they were able to complete millions of dollars of 'real' transaction at beneficial ·prices solely because the Insider Defendants needed the cover of 'real' transactions and the respectability derived from doing business with the best known businesses in the grocery and health and beauty aid industry." Receiver's 2d Am. Ancill. Compl. ¶ 126, Ex. 2 to Escalante Decl.

**7.** Federal contends that the practice was not always followed; Vons responds that not every transaction was confirmed. Vons UF No. 20.

**8.** Federal contends that Vons only has shown evidence of reliance with respect to the Deckelbaum and Lipson controlled entities and that the Schwartz entities did not confirm. Vons responds that Dawna Bowman stated that she or her co-worker, Kathy Ferraro, confirmed every transaction for the Schwartz entities. Vons UF No. 33.

Funding entities did not fund transactions they were unable to confirm. Vons UF No. 34.

Premium Sales paid Shirley for falsely confirming to the funding entities that purchase orders, invoices, and wiring instructions containing Vons' name and bank account information were legitimate. Vons UF No. 53. Among the funding entities that funded transactions purportedly involving Vons were those controlled by Arthur Lipson, Mort Deckelbaum, Jack Yoches, Samuel Schwartz, and Henry Weitzman. Vons UF No. 54. Arthur Lipson's funding entities included Premium Southeast Associates, Premium Southeast Partners, Premium Southeast Ventures, PSEC Joint Venture, and J & A Baco Partners (together, the "Lipson funding entities"). Vons UF No. 55. Mort Deckelbaum's entity was Expo Associates. Vons UF No. 56. The entities that Samuel Schwartz and Henry Weitzman controlled included Premium S.H. and Premium S.H. (92) (together, the "Schwartz/Weitzman funding entities"). Vons UF No. 57.

Arlyne Breitbart and Arthur Lipson called grocers to confirm the transactions on behalf of the Lipson funding entities. Vons UF No. 58. Mort Deckelbaum, Gerald Deckelbaum, and Jack Gutjahr called grocers on behalf of Expo Associates. Vons UF No. 59. Dawna Bowman and Kathy Ferrara called on behalf of the Schwartz/Weitzman funding entities. Vons UF No. 60.

Shirley confirmed transactions that were not legitimate. Vons UF No. 61. From 1990 to 1991, Shirley confirmed hundreds of false transactions for over $40 million in fictitious deals purportedly involving Vons. Vons UF No. 63. Based on these fictitious documents and other fictitious deals, investors gave Premium Sales hundreds of millions of dollars. Vons UF No. 64. As a result of the false confirmation activities of Shirley and others, Premium Sales was able to continue to appear to be a legitimate business and to induce additional investment until 1993. Vons UF No. 65.

In November 1991, Vons received a tip that Shirley was soliciting kickbacks. Vons UF No. 66. After Vons confronted Stanford Trading, Stanford Trading interviewed Shirley and confirmed that he had been receiving kickbacks on some of Vons' transactions. Vons UF No. 67. Although the parties dispute how much Allan Birholtz of Stanford Trading knew or told Vons, he did conduct an investigation. *Id.* During his investigation, Birholtz determined that the company paying Shirley for confirming was probably Premium Sales. Vons UF No. 122.

Birholtz met with Vons' representatives in late November 1991. Vons UF No. 123. Vons contends that the primary topic discussed at the meeting was whether Vons had lost opportunities on the diverting market because of the kickbacks. Vons UF No. 124. Birholtz reported his conclusions to Vons. Vons UF No. 118. Birholtz told Vons that Shirley had been paid for "confirming." Vons UF No. 125. Vons argues that what Birholtz told Terrence Wallock, Vons General Counsel, was not enough to enable Wallock to deduce that Shirley had participated in the forgery of any documents or that he was colluding with anyone to confirm fictitious transactions, that Premium Sales was conducting a Ponzi scheme or otherwise defrauding investors, or that investors in Premium would have any basis for later suing Vons. *Id.*

Vons contends that it did not know and could not have known in November 1991 the significance of Shirley's activities. Vons UF No. 128. Neither Vons nor Stanford knew what kind of deals Shirley was paid to confirm. Vons UF Nos. 129, 130. Vons contends that it did not have adequate information in 1991 to infer that a loss covered under Vons' crime insurance policy might result from Shirley's actions. Vons UF No. 133. Federal argues that Vons *was* aware in 1991 that Shirley had been taking bribes from Premium and was laundering the bribes through an account

in the Bahamas. Although Vons could not empirically quantify the amount of harm, it believed that Shirley's conduct had harmed it. *Id.*

Vons told Stanford that it wanted Shirley off its premises immediately. Vons UF No. 68. Stanford fired Shirley in November 1991. Vons UF No. 69. Sometime between late 1991 and early 1992, Vons terminated its relationship with Stanford. Vons UF No. 70.

Vons investigated to determine whether the kickbacks Shirley took damaged Vons. Vons UF No. 71. At first, Vons thought it possible that it had not obtained the best possible deals from Shirley's secondary market transactions. Vons UF No. 72. Vons could not determine whether and to what extent Shirley had passed up better opportunities. Birholtz conducted an investigation and concluded that Vons had not paid too much for product purchased. *Id.* Vons was not able to confirm any profit loss as a result of Shirley's kickbacks. Vons UF No. 73. Stanford Trading conducted a detailed investigation of nearly all of Shirley's transactions and was also unable to confirm any dollar loss to Vons. Vons UF No. 74. After the investigation, Stanford Trading assured Vons that, notwithstanding Shirley's dishonesty, Vons had not lost any money. Vons UF No. 75.

In June of 1993, investors in Premium Sales discovered that Premium was operating a Ponzi scheme to defraud new investors by using their money to pay profits to prior investors. Vons–Fed. UF No. 64. Harley Tropin was appointed receiver and trustee of the Premium Sales Corporation and several of its related companies in the Summer of 1993. Vons–Fed. UF No. 5. Tropin brought the action *Walco Investments, Inc. v. Thenen*, 947 F.Supp. 491 (S.D.Fla.1996) on behalf of Premium Sales' creditors, ninety-eight to ninety-nine percent of whom were investors. Vons–Fed. UF Nos. 6, 77. A class of plaintiffs including individuals and entities who invested or loaned funds to Premium, their partnerships, and their funding entities brought the lawsuit *Walco Investments, Inc. v. Thenen*, USDC, SD Fla., Case No. 93–2534–Civ–Moreno. Vons–Fed. UF Nos. 4, 78.

In October 1995, Vons was added as a defendant in the amended complaints filed in *Tropin, v. Thenen* and *Walco Investments, Inc. v. Thenen*, Vons–Fed. UF No. 4.[9] Each of the lawsuits arose out of the collapse of Premium Sales Corp. Vons–Fed. UF No. 7.

The lawsuits alleged that Premium Sales engaged in a multi-year Ponzi scheme that defrauded investors out of hundreds of millions of dollars. Vons–Fed. UF No. 8. The Plaintiff and Cross–Complainants alleged that Gene Shirley was Vons' agent while he worked as a diverter buyer on Vons' premises. Vons–Fed. UF No. 80. The Plaintiffs and Cross–Complainants sought to hold Vons jointly and severally liable for all damages the investors suffered, approximately $300 million. Vons–Fed. UF No. 81. Vons settled the cases for $10 million in October 1996. Vons–Fed. UF No. 82. Wallock states that Vons would not have settled the cases for more than a nominal sum if the theories attempting to hold Vons liable for Shirley's misconduct were not in the case. Vons–Fed UF No. 103.

Vons contends that but for Shirley's false confirmation of the fictitious invoices, purchase orders, and wiring instructions, Vons would not have been sued in the *Premium Sales* lawsuits. Vons–Fed. UF No. 100. Federal argues that plaintiffs also sued Vons for its own misconduct in covering up its discovery in 1991 of Shirley's wrongdoing. *Id.*

On May 17, 1996, Vons gave notice to Federal of the loss which is the subject of this lawsuit. Vons–Fed. UF No. 74. On July 29, 1996, Vons submitted its proof of loss statement to Federal. Vons–Fed.

**9.** These two suits are known collectively as the *"Premium Sales"* lawsuits.

UF No. 75. Federal denied the claim on October 22, 1996.

## III.

## DISCUSSION

### A. *Standard*

A motion for summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 1). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

In a trilogy of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex, supra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electrical Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case.

*See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, citing *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. at 2512. As the Supreme Court explained in *Matsushita,*

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted).

To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. FED. R. CIV. P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Similarly, "[a] party cannot create an issue of fact by a declaration contradicting his or her own deposition or other sworn testimony."

Schwarzer, Tashima, & Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* ("*Fed.Civ.Proc.*") ¶ 14:166 (1997), *citing Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–72 (7th Cir.1996); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975).

■ In an insurance case, the party seeking to establish coverage has the burden of proving that the underlying acts are within the scope of the basic coverage of the insuring clauses. *Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d 532, 537, 226 Cal.Rptr. 435, 437 (1986). Once the insured meets that initial burden, the insurer bears the burden of proving that an exclusion precludes coverage. *Merced Mut. Ins. Co. v. Mendez*, 213 Cal.App.3d 41, 47, 261 Cal.Rptr. 273, 277 (1989); *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 880, 151 Cal.Rptr. 285, 292, 587 P.2d 1098 (1978).

### B. *Analysis*

Vons sought coverage under two separate insuring clauses, numbers 1 (employee theft) and 4 (depositors forgery). Because Vons evidently believes Clause 4 offers it the better chance for coverage,[10] the discussion begins with this clause.

#### 1. *Clause 4*

Vons must establish three elements to obtain coverage under Clause 4:(1) a "direct loss" (2) caused by theft or forgery, and (3) forged documents of the type listed in Clause 4. Vons Summ. J. Mem., 8.[11]

─────────

**10.** Vons moved for summary judgment on that clause and for partial summary judgment with respect to the first clause.

**11.** Federal adds a fourth requirement, namely, that the forged document be "made or drawn by or drawn upon Vons." Memorandum of Points and Authorities in Opposition to Plaintiff's Summary Judgment/Partial Summary Judgment Motion ("Fed.Opp'n.Mem."), 3.

**12.** Employee dishonesty policies differ from liability policies. The former "insure against

■ On the first element, Vons contends that its payment of $10 million to settle the two *Premium Sales* actions constitutes a "direct loss" under the policy. *Id.* at 9. The term is not defined in the policy, but Vons relies on Section 11, "Ownership," which provides:

> The Company's liability under this coverage section shall apply only to Money, Securities or other property owned by the Insured or for which the Insured is legally liable, or held by the Insured in any capacity whether or not the Insured is liable; provided that the Company shall not be liable for damage to the Premises unless the Insured is the owner or is liable for such damage.

Burch Decl., Ex. 1, at 31. This provision, Vons argues, establishes that the policy is not just for indemnity.[12] Moreover, Vons contends that it was obligated to pay $10 million basically because of its "employee" Shirley's dishonesty. Vons Summ. J. Mem., 12.

Federal responds that Vons admitted that it suffered no *direct* loss as a result of Shirley's confirmation of the false invoices, purchase orders, and wire information documents. Fed. Opp'n. Mem., 19. In addition, Shirley's activities ceased in November 1991, when Stanford fired him. When asked, every funding entity confirmed that its investors incurred no losses prior to *1993*. And the losses the investors did suffer did not result from the invoices, purchase orders, or wire information documents that Shirley "confirmed." *Id.* There

─────────

the risk of property loss through employee dishonesty." *Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*, 140 F.3d 622, 629 (5th Cir.1998), *citing 175 East 74th Corp. v. Hartford Accident & Indem. Co.*, 51 N.Y.2d 585, 435 N.Y.S.2d 584, 416 N.E.2d 584, 587 (1980). Meanwhile, liability policies "require an insurer to discharge an obligation of the insured to a third party for some act of the insured or its employee." *Id.* Just because the word "liability" appears in an employee dishonesty policy, an indemnity policy does not then become a liability policy. *Id.*

was no "direct loss" to Vons based on these documents. *Id.* at 20.

Federal argues in addition that Vons' liability in the *Premium Sales* actions was not premised solely on Shirley's activities. Those lawsuits targeted grocers like Vons in part based on their vicarious liability, arguing that "confirmers" operated on the grocers' premises and that their apparent connection to the grocers, whether they were employees or agents, rendered the grocers liable. However, Vons also knew as early as November 1991 of Shirley's crimes, yet continued doing business with Premium and failed to report Shirley's conduct to the authorities. *Id.* at 14. Federal maintains that Vons' own actions, not just Shirley's, led to its inclusion in the *Premium Sales* lawsuits.

■ A careful review of each element required for coverage under Clause 4 reveals serious obstacles for Vons to overcome. First, there does not appear to be a "direct loss." Vons contends that the covered loss is its $10 million settlement. But that settlement, according to Vons, was a result of its *liability* in the *Premium Sales* actions. The policy here is for indemnity, not liability, except in extremely limited circumstances. Notably, the liability in the *Premium Sales* cases was not with respect to property or money that Vons either "owned" or "held." Vons never "held" the investors' money or property.

Indeed, Vons plainly knew that it had suffered no "direct loss" under the policy, as evidenced by the fact that it did not make a claim or file a proof of loss with Federal when Shirley's activities were discovered in 1991. Only later when the *Premium Sales* actions were settled did Vons attempt to shoehorn that payment into the terms of the policy. In short, Vons adopted a "wait and see" posture, even when the actions were filed in 1993. This fact, in itself, illustrates the "conditional nature" of the loss, taking it out of the policy. *See, e.g., ITT Hartford Life Ins. Co. v. Pawson Assoc., Inc.*, 1997 WL 345345, at *2 (Conn.Super.Ct. June 16, 1997) (conditional nature of loss shows that it is indirect).

Vons also fails to establish that the loss was caused by a "forgery." Vons misconceives the difference between fraud and forgery. Vons essentially assumes there was a forgery, actually, many forgeries, albeit perpetrated by those Shirley colluded with, not Shirley personally. Vons Summ. J. Mem., 24–25. It is important to recognize, however, that the allegedly forged documents—purchase orders, invoices, and wiring instructions containing Vons' name and bank account information—"purport[ed] to show [that] real transactions with Vons were legitimate... In fact, these transactions were fictitious." *Id.* at 5. That is, the information the documents contained was false. Vons does not allege (or establish) that these documents "fraudulently purport to be what [they are] not." *People v. Bendit*, 111 Cal. 274, 277, 43 P. 901 (1896).

Even leaving aside the issue of whether a forgery must contain a signature, this distinction is crucial. As one of the California courts of appeal explained, "[t]he common law rule of forgery began as a species of treason, including such acts as falsifying the king's seal and counterfeiting money." *Lewis v. Superior Court*, 217 Cal.App.3d 379, 387, 265 Cal.Rptr. 855, 858 (1990). The court added:

> The comment to Model Penal Code section 224.1 suggests that forgery developed as an offense independent of theft by false pretenses most importantly because of the narrowness of the law of attempt.... The offense is maintained as a distinct, felony offense from theft by false pretenses because forgery threatens the system of written instruments upon which modern commerce critically depends.

217 Cal.App.3d at 387–88, 265 Cal.Rptr. at 858. Here, Premium could and did make invoices, purchase orders, and wire information sheets in legitimate transactions. The distinction worth noting for insurance coverage purposes is that the information *in* these documents with respect to Vons was false, not forged. Clause 4 does not cover the former.

Clause 4 also specifies that coverage requires forgery of certain types of documents. It is not the same to say that the investors' reliance on the legitimacy of the invoices, purchase orders, and wire information is interchangeable with the forgery of a negotiable instrument or its equivalent. As the court explained in *Lewis*, above, the rationale behind making forgery a crime is the need of business to rely on negotiable instruments. *See also People v. Bendit*, 111 Cal. at 281, 43 P. 901 ("A very large part of the business of civilized countries is done by means of negotiable instruments. These are rarely presented by the makers, but are paid to others on the faith that the signatures, and the bodies of the instruments, are genuine."). As a result, the documents have traditionally been those with legal effect, documents that can be "deposited." The invoices and other documents here, are not of that type.

There can be no doubt, moreover, that the policy unequivocally contemplates documents of the same type and effect as checks and drafts. Clause 4 lists three examples, (A) through (C), specifying "any check or draft," "any check or draft," and "any payroll check, payroll draft or payroll order," respectively. Burch Decl., Ex. 1, at 28. The clause also refers to the Insured or the Insured's bank of deposit, adding further clarity to the scope of coverage provided therein. *Id.* In short, Clause 4 leaves no real room to interpret its coverage in the manner Vons proposes.

Even with respect to the requirement that the forged document be made or drawn by one acting as an agent of Vons, Vons cannot succeed and thereby obtain coverage under Clause 4. Premium, of course, was the "maker" of all the documents and was in no way Vons' agent. Moreover, these invoices, purchase orders, and wire information sheets, admittedly false, could not, in any event, be "drawn upon," by Vons or by Shirley.

In sum, Vons cannot squeeze its indirect loss into the parameters of Clause 4, "depositors forgery coverage." Federal thus prevails as a matter of fact and law.

### 2. *Clause 1*

■ Vons has moved for partial summary judgment on the employee theft clause, while Federal has moved for summary judgment. As quoted above, Clause 1 requires (1) a direct loss, (2) of money, securities, or property, (3) by an employee (acting alone or with others). Vons' pursuit of coverage fares no better under this clause.

First, Shirley was not a Vons employee. He worked for Stanford. Vons' own General Counsel submitted an affidavit in the *Premium Sales* litigation detailing myriad reasons why Shirley was not Vons' employee.

■ Furthermore, in the very proof of loss that, when denied, prompted *this* lawsuit, Vons again stated that Shirley was not its employee. In that document, attached as Exhibit B to Vons' Complaint, Plaintiff declared that Gene Shirley was "an employee of Stanford Trading, Inc., which company provided services to Vons as an independent contractor." Burch Decl., Ex. 1, at 55. Vons alleged that Shirley was Stanford's employee in paragraph 18 of the Complaint itself and incorporated the proof of loss statement by reference in paragraph 24. *Id.* at 12, 14.

The Ninth Circuit has made it clear that a party may not change its position as

Vons attempts to do here, without consequences. Quoting Judge Hall's dissent in *Religious Tech. Ctr. v. Scott,* 869 F.2d 1306, 1311 (9th Cir.1989) (citation omitted), the court affirmed the principles of judicial estoppel, as follows:

> The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . . Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion. . . . Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion *made in the same proceeding or a prior one.*

*Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990) (emphasis added). The doctrine is " 'intended to protect against a litigant playing "fast and loose with the courts." ' " *Id.* (citations omitted).

Vons has failed to offer any reason why it should be allowed to take blatantly contradictory positions in this case or as between the *Premium Sales* litigation and the instant action. To the extent counsel suggested at oral argument that taking an inconsistent position is allowable because in defending itself vigorously in the *Premium Sales* litigation Vons was "doing what it was supposed to do," the Court strongly rejects this purported justification. The notion that "anything goes" is precisely the type of "fast and loose" game-playing that the doctrine of judicial estoppel is intended to prevent. Accordingly, Vons is estopped from arguing here that Shirley was its employee.

■ Vons' contention that Shirley was a "temporary employee" as defined by the policy is also unpersuasive. Shirley was on Vons' premises for nearly four years. In addition, Stanford was not an employment agency or its equivalent. Rather, Vons contracted with Stanford to operate Vons' diverting efforts. *Id.* ¶ 18 ("Vons entered into an agreement with Stanford Trading, Inc. ('Stanford') for Stanford to assist Vons as a buyer and seller of diverted goods."). Vons did not contract with Stanford to provide Vons with personnel per se.

As for the "independent contractor" exception to the exclusion, which would possibly allow for coverage in circumstances such as those here, the exception was not even added until *after* Stanford fired Shirley and Vons terminated its agreement with Stanford. Under the definition of employee that was in effect when Shirley worked on Vons' premises, Shirley was not a Vons employee, temporary or otherwise.

As discussed above with respect to the other elements of coverage under Clause 1, the settlement figure does not constitute a "direct loss," and Vons admits it lost no money, security, or property due to Shirley's "theft" or "forgery," even assuming he committed these offenses. Vons cannot carry its burden of establishing that a genuine issue of material fact exists for trial so as to defeat Federal's motion or that the undisputed facts demonstrate that the underlying acts are within the scope of the basic coverage of the Clause 1, thus requiring judgment in Vons' favor on its motion for partial summary judgment. Federal prevails on this argument regarding coverage as well.

## IV.

## CONCLUSION

For the reasons set forth above, Federal Insurance Company's motion for summary judgment is hereby *granted* and the motion of The Vons Companies, Inc. is *de-*

*nied.* A separate judgment will be entered accordingly.

IT IS SO ORDERED.