The VONS COMPANIES, INC.,
Plaintiff–Appellant,

v.

FEDERAL INSURANCE COMPANY,
Defendant–Appellee.

No. 98–56645.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 2000

Filed May 9, 2000

Michael R. Doyen and Cary B. Lerman, Munger, Tolles & Olson, Los Angeles, California, for the plaintiff-appellant.

David T. DiBiase, Carleton R. Burch, Anderson, McPharlin & Conners, LLP, Los Angeles, California, for the defendant-appellee.

Before: REINHARDT and O'SCANNLAIN, Circuit Judges, and SCHWARZER,* Senior District Judge.

SCHWARZER, Senior District Judge:

The appellant, The Vons Companies, Inc., (Vons), seeks coverage for a $10 million dollar payment it made to settle two lawsuits in which it was sued under respondeat superior for the tortious actions of one Gene Shirley. The lawsuits were brought by investors in a scheme who suffered losses due in part to Shirley's fraud. We must decide whether Vons was entitled to coverage under its employee dishonesty policy issued by Federal Insurance Company (Federal), which insured it against "direct losses ... caused by ... any employee." The district court granted Federal's motion for summary judgment and we affirm.

## FACTUAL BACKGROUND

The controversy in this case stems from a legitimate practice known as "diverting," under which grocers buy and sell on a secondary market. Because of regional differences in the price of merchandise sold by manufacturers, grocers can occasionally purchase products from retailers in another part of the country at a price lower than they would have to pay for the product wholesale. Diverters act for grocers to purchase goods at off-market prices in one location and sell them to retailers in another location for a profit.

The diverting operation at Vons was handled by one Gene Shirley, who had been posted on Vons's premises for this purpose by Stanford Trading Company. On behalf of Vons, Shirley bought diverted goods from and sold diverted goods to Premium Sales Company (Premium). Premium's operations were financed by investors in funding entities who lent funds at extravagant interest rates. The investors' money was needed to provide a float because the selling grocers required payment in advance and the buyers demanded credit terms. While Premium engaged in some legitimate transactions, many of its transactions were fictitious. To lend an appearance of legitimacy to these transactions, Premium told the funding entities that their money would be used to effectuate specific buy/sell transactions. With respect to each particular transaction, Premium identified the grocer who had agreed to sell a product and the grocer who had agreed to buy. It also gave the funding entities the names of individuals at the various grocers whom they could contact to confirm a transaction. The funding entities relied on the confirmers' word in deciding to finance transactions.

Shirley was a confirmer for Premium at Vons, for which he received secret payments from Premium. He falsely confirmed some 500 fictitious transactions ostensibly in Vons's name. Premium obtained over $40 million from investors on account of transactions Shirley falsely confirmed. Vons, for its part, lost no money.

Not surprisingly, the exorbitant returns from this program turned it into a Ponzi scheme as Premium diverted funds from

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

new investors to pay old investors instead of financing legitimate transactions. In 1993, Premium's investors discovered the fraud and brought two lawsuits. In October 1995, Vons was added as a defendant in the suits. Its liability was predicated on Shirley's actual or apparent authority to act for Vons and on Vons's negligent supervision of Shirley. Damages of some $300 million were claimed. In 1996, Vons settled the claims against it by a payment of $10 million.

Vons then submitted a proof of loss to Federal for the $10 million, stating that it had suffered a "direct loss of money ... caused by thefts and forgeries by Gene Shirley." Under an Executive Protection Policy issued by Federal, Vons had crime coverage from at least 1986 through 1996. Insuring Clause 1 covered Vons for "direct losses of Money ... caused by Theft or forgery by any Employee of any Insured acting alone or in collusion with others." Insuring Clause 4 covered Vons for "direct losses caused by forgery [of certain types of documents] made or drawn by, or drawn upon the Insured, or made or drawn by one acting as agent of the Insured." Federal denied the claim and this action followed. The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) and granted Federal's motion for summary judgment. *See The Vons Companies, Inc. v. Federal Ins. Co.,* 57 F.Supp.2d 933 (C.D.Cal.1998). We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## DISCUSSION

Vons's principal contention is that the district court erred in rejecting its interpretation of the policy as providing liability coverage. Vons's argument rests on section 11 of the policy which provides in relevant part that coverage "shall apply only to Money, Securities or other property owned by the Insured *or for which the Insured is legally liable,* or held by the Insured ... whether or not the Insured is liable." (Emphasis added.) By its plain language, Vons argues, the policy covers "money for which the insured is legally liable." According to Vons, it became legally liable for the $10 million attributable to Shirley's actions when it entered into the settlement agreement with the plaintiffs in the Premium litigation.

The problem with the argument is that it is founded on the interest clause of the policy ("ownership"), not the insuring clauses. Under the insuring clauses, Vons is covered only for direct losses to Vons caused by its employee's dishonesty, not for vicarious liability for losses suffered by others arising from its employee's tortious conduct. A direct loss to Vons may, of course, be caused by its employee's theft of property for which it is legally liable, the typical case being where the insured is a bailee or trustee of property. *See, e.g., Alberts v. American Cas. Co.,* 88 Cal. App.2d 891, 200 P.2d 37 (Cal.Dist.Ct.App. 1948) and *Ins. Co. of N. Am. v. Gibralco, Inc.,* 847 F.2d 530, 533 (9th Cir.1988). Vons's reliance on these cases is inapposite because the claim against it does not arise from the theft of property for which it is legally liable. Instead, the loss Vons suffered resulted from the threat of vicarious liability for Shirley's tort which caused damage to third parties.

Vons's argument was squarely rejected in *Lynch Properties, Inc. v. Potomac Ins. Co.,* 140 F.3d 622 (5th Cir.1998). A bookkeeper employed by Lynch Properties had misappropriated funds from the personal bank account of Mrs. Lynch, for whom Lynch Properties performed bookkeeping and management services. When Lynch Properties discovered that funds were missing from the bank account, it reimbursed Mrs. Lynch and filed a claim under its employee dishonesty policy, which contained a clause similar to section 11 of Vons's policy. The court held that the funds in Mrs. Lynch's separate bank account were neither held by Lynch nor were they funds for which it was "legally liable," stating:

Employee dishonesty policies insure against the risk of property loss through

employee dishonesty. [Citation omitted.] Liability policies, by contrast, require an insurer to discharge an obligation of the insured to a third party for some act of the insured or its employee. [Citation omitted.] Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, [citation omitted], these policies do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees. [Citation omitted.] Mere insertion of the words "legal liability" into an employee dishonesty policy does not transform the policy into a liability policy.

*Lynch,* 140 F.3d at 629. The court specifically rejected Lynch's argument that it became legally liable for the funds when the bookkeeper misappropriated them because "this argument fails to show how it was 'legally liable' for the stolen property itself." *Id.* The argument "would transform this policy, which insures property loss for which Lynch Properties is legally liable, into a policy insuring any vicarious liability arising from an employee's dishonesty." *Id. See also FDIC v. United Pac. Ins. Co.,* 20 F.3d 1070, 1080 (10th Cir.1994) (bank suffers direct loss when its funds are disbursed due to employee's dishonesty). In other contexts, too, courts have acknowledged the difference between liability policies and employee dishonesty policies meant to indemnify the insured. *See First Nat'l Bank of Louisville v. Lustig,* 975 F.2d 1165, 1167 (5th Cir.1992) (employee dishonesty policy insures against direct loss sustained by the insured, not liability); *see also Anderson v. Employers Ins. of Wausau,* 826 F.2d 777, 780 (8th Cir.1987) (bankers blanket bond not liability insurance for purposes of direct action statute).

Vons places principal reliance on *First Am. State Bank v. Continental Ins. Co.,* 897 F.2d 319 (8th Cir.1990). The insured bank suffered losses as a result of a fraudulent scheme by one of its officers to make secret loans of bank funds to customers who, in turn, lent the funds to him against his promissory notes. When he defaulted on those notes, the customers refused to pay their bank loans and threatened suit against the bank. The bank settled the claims arising from its officer's fraudulent transactions essentially by canceling the customers' debts to the bank. The court held that the bank was entitled to recover its losses under its statutory bankers blanket fidelity bond. It held that under Iowa law, a bankers fidelity bond covers two types of losses: (1) a direct loss of money, and (2) third party liability incurred. It explained:

Loss under the Bond mean[s] actual depletion of bank funds caused by an employee's dishonest acts. [Citation omitted.] First Bank sustained a direct loss as a result of each dispersal of funds under the fraudulent loan scheme engineered and executed by Clawson.

*Id.* at 325.

*First American Bank* is distinguishable on its facts, because the bank's employee, by fraudulently lending the bank's money, caused it to lose funds, and on the law, because it turns on the interpretation of a statutorily required bankers bond. Vons's other cases are similarly distinguishable. *See Ins. Co. of N. Am.,* 847 F.2d at 532 (holding that bond covered security firm's loss from employee's theft of customer's bonds); *see also Downey Sav. and Loan Ass'n v. Ohio Casualty Ins. Co.,* 189 Cal. App.3d 1072, 234 Cal.Rptr. 835 (Cal.Ct. App.1987) (finding that bond covered "any loss").

Under its policy, Federal provided Vons with coverage for "direct losses" that were "caused by" employee theft or forgery. Vons's policy did not provide coverage for third party claims. *Cf. First Am. Title Ins. Co. v. St. Paul Fire and Marine Ins. Co.,* 971 F.2d 215, 217 (9th Cir.1992). We hold that "direct" means "direct" and that in the absence of a third party claims clause, Vons's policy did not provide indemnity for vicarious liability for tortious

acts of its employee. Our disposition of the coverage issue makes it unnecessary to reach other issues.

AFFIRMED.