816 A.2d 1068 (2003)
358 N.J. Super. 28
AUTO LENDERS ACCEPTANCE CORPORATION, Plaintiff,
v.
GENTILINI FORD, INC., Defendant/Third-Party Plaintiff-Respondent,
v.
PNC Bank, N.A., Randy Carpenter, Richard Baker, Shawn Hamilton, Shanda Boddie, Sean Murray, Thomas Eidell, Christopher Jackson, Tamika Fortune, Starr Barnum, Cassandra Brock, Latoya Savage, Kenyatta Saunders, Kenneth Graham, Corneilia Thrower, Joyce Taylor, Alfie Stephens, Delores Simpson Tairat Ajoke Disu, Raymond Bickel, Edward Isiah Graham, Troy Butler, Julius Jermelle, Eugene Cobbs, Michael White, Jr., Benjamin Mansfield, Wayne Tucker, Charles Lentz, Joann Jacobs, Michele Sloan, Tiffany Richardson, Third-Party Defendants,
and
Ohio Casualty Group of Insurance Companies, American West Fire & Casualty Company and West American Insurance Co., Third-Party Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2002.
Decided March 5, 2003.
*1069 Andrew S. Kent, Springfield, argued the cause for Third-Party Defendants/Appellants (Wolff & Samson, attorneys; Scott D. Baron, of counsel; Mr. Kent, on the brief).
Eric Garrabrant argued the cause for Third-Party Plaintiff/Respondent (Serber, Konschak & Jaquett, attorneys; Mr. Garrabrant of counsel and on the brief).
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by FUENTES, J.A.D.
Third-party defendants, Ohio Casualty Group of Insurance Companies, American West Fire and Casualty Company and West American Insurance Company, (Ohio Casualty Group) appeal a judgment in favor of defendant/third-party plaintiff, Gentilini Ford, in the amount of $191,206.83, representing damages suffered as a result of the dishonest acts of its former employee, Randy Carpenter. The loss originates from a fraudulent credit scheme conceived and carried out by Carpenter.
As a salesperson for Gentilini, Carpenter submitted fraudulent applications to Auto Lenders Acceptance Corp. (Auto Lenders) *1070 to induce it to finance car purchases to high risk customers. After several of those customers defaulted on their loans, Auto Lenders discovered the fraud and brought suit against Gentilini for participating in the fraud. Carpenter, who was Gentilini's Finance Manager, provided customers with fictitious pay stubs and completed credit applications with knowingly false information intended to improperly bolster the customer's creditworthiness. Gentilini settled that action for $215,000.
Gentilini brought a third-party action against its insurers under the "employee dishonesty extension" of the property insurance section of its commercial coverage insurance policy, seeking a defense to Auto Lenders' suit and indemnification. The insurers declined coverage. On cross-motions for summary judgment, the motion judge granted Gentilini's motion and denied the insurers' motion. We conclude that the Law Division erred in construing the policy of insurance as providing indemnity coverage to Gentilini and reverse.

I
Gentilini is an automobile dealership. Pursuant to a written agreement, PNC Bank provided financing for motor vehicle installment sales contracts that Gentilini would execute with its customers. Auto Lenders agreed to finance those installment sales contracts rejected by PNC. For each approved contract, Gentilini retained the cash deposit paid by its customer and collected the financed portion of the sales price from PNC or Auto Lenders. Gentilini assigned to PNC or Auto Lenders its rights under the customer's installment contract, including any security interest and related insurance. In the event of default by the customer, Auto Lenders was entitled to require Gentilini to repurchase, without recourse, all outstanding contracts purchased by Auto Lenders from Gentilini for the amount of the aggregate unpaid balance due.
In June 1997, Gentilini and the Ohio Casualty Group entered into an insurance contract. The relevant policy language is as follows:
Employee Dishonesty:
(1) You [Gentilini] may extend the insurance provided by this Coverage Form to apply to direct loss of or damage to Business Personal Property and "money" and securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:
(a) Cause you to sustain loss or damage; and also
(b) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:
(i) Any employee; or
(ii) Any other person or organization.
* * * * * *
(3) The most we will pay under this Extension for loss or damage in any one occurrence is $5,000.
(4) All loss or damage:
(1) Caused by one or more persons; or
(2) Involving a single act or series of related acts; is considered one occurrence.
The policy defines "money" as:
currency, coins, bank notes in current use and having a face value, travelers checks, register checks and money orders held for sale to the public.
The term "securities" is defined as:
all negotiable and non-negotiable instruments or contracts representing either "money" or other property. "Securities" includes revenue and other stamps (whether represented by actual stamps *1071 or unused value in a meter) in current use, tokens and tickets, and evidence of debt issued in connection with credit or charge cards, which cards are not issued by you, but does not include money.
The motion judge decided in favor of coverage and made the following findings:
It is undisputed that Mr. Carpenter was an employee of Gentilini Ford. This court finds that the fraudulent acts that Mr. Carpenter committed in order to obtain loans for prospective automobile purchasers were dishonest. Ohio Casualty contends that the policy was intended to protect against embezzlement or theft but the policy states "dishonest acts." The policy does not define "dishonest acts." This court holds that if Ohio Casualty intended "dishonest acts" to mean embezzlement and theft then either "dishonest acts" would have been defined as such or the policy would have stated embezzlement and theft rather than "dishonest acts." For these reasons and the fact that the frauds undertaken by Mr. Carpenter were dishonest, this court finds that the fraud fall within the meaning of "dishonest acts."
The motion judge further held that the loss sustained by Gentilini, as a result of the law suit brought by Auto Lenders was a "direct loss" within the meaning of the policy based on the so-called Appleman's Rule which provides that:
Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produced the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss. It is not necessarily the last act in a chain of events which is, therefore, regarded as the proximate cause, but the efficient or predominant cause which sets into motion the chain of events producing the loss. An incidental peril outside the policy, contributing to the risk insured against, will not defeat recovery.... In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.

[Franklin Packaging Co., v. California Union Ins. Co., 171 N.J.Super. 188, 191, 408 A.2d 448 (App.Div.1979), (citing 5 Appleman, Insurance Law and Practice § 3083 at 309-311 (1970)).]
Under this reasoning, the motion judge found "an unbroken sequence" of events all leading to a recoverable loss: Carpenter's fraud against Auto Lenders precipitating in Auto Lenders' suit against Gentilini, which in turn resulted in a loss to Gentilini.

II
On appeal from a grant of summary judgment, we use the same standard as the motion judge: first we decide whether there is a genuine issue of material fact, and if none, we then decide whether the Law Division's ruling on the law is correct. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995); Southern Jersey Family Med. Ctrs., Inc., v. City of Pleasantville, 351 N.J.Super. 262, 279, 798 A.2d 120 (App.Div.), certif. granted, 174 N.J. 545, 810 A.2d 65 (2002); Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998); R. 4:46-2.
Our analysis will be guided by well-established principles of insurance law.
When examining an insurance contract, the first step is to determine whether the policy is ambiguous. If a court determines that the policy is clear and *1072 unambiguous the policy must be enforced as written. However, if the policy clause is found to be ambiguous, any ambiguities must be resolved against the insurance carrier and in accordance with the objectively reasonable expectations of the insured. A policy provision is considered ambiguous if the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. If the policy is considered ambiguous, the reviewing court should determine whether more precise language by the insurer, had such language been included in the policy, would have put the matter beyond reasonable question.

[U.S. Mineral Prods. Co., v. American Ins. Co., 348 N.J.Super. 526, 538, 792 A.2d 500 (App.Div.2002) (citations omitted)].
However, the insured bears the burden of establishing that a claim is within the policy terms. Cobra Prods., Inc. v. Federal Ins. Co., 317 N.J.Super. 392, 401, 722 A.2d 545 (App.Div.1998), certif. denied, 160 N.J. 89, 733 A.2d 494 (1999). Here, the policy language unambiguously describes the type of coverage to be limited to direct loss from an act of dishonesty by an employee with the "manifest intent to cause loss or damage" to the insured. However, Carpenter's criminal acts were intended to defraud Auto Lenders, not Gentilini.
Indeed, as the direct seller of the automobiles, Gentilini became the unintended beneficiary of the fraud by receiving the proceeds of the illicit sales. Such sales proceeds were not limited to the percentage of the sale's price financed by Auto Lenders. Gentilini received and kept the down payment paid by the buyers,[1] received full credit for the amount of the loan amortized by the debtors and retained its right to institute legal action directly against the buyers, both to repossess the collateral and seek payment of the outstanding loan balance.[2]
Thus, under these undisputed facts, coverage cannot be found in Gentilini's favor. This principle was succinctly elucidated by the court in F.D.I.C. v. Nat'l Union Fire Ins. Co., 205 F.3d 66 (2d Cir.2000):
[B]y their clear terms, the fidelity bonds require that the unfaithful employee must intend to cause the employer a loss directly and solely relating to the faithless act, classically describing embezzlement or another type of theft from the employer[.] An embezzler, at one end of the continuum, necessarily intends to cause the employer the loss, since the employee's gains are directly at the employer's expense. At the other end of the continuum, not triggering fidelity coverage, is the situation where the employee's dishonesty at the expense of a third-party is intended to benefit the employer, since the employee's gain results from the employer's gain. Under such circumstances, even if the employer suffers a loss, fidelity coverage is not triggered.
[Id. at 72 (citations omitted).].
We also agree with and adopt the reasoning of the Fifth Circuit in Lynch Prop., Inc., v. Potomac Ins. Co., 140 F.3d 622 (5th Cir.1998):
Employee dishonesty policies insure against the risk of property loss through *1073 employee dishonesty. Liability policies, by contrast, require an insurer to discharge an obligation of the insured to a third party for some act of the insured or its employee. Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, these policies do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees.

[Id. at 629 (citations omitted).].
A similar conclusion was reached by the Ninth Circuit in Vons Cos., Inc. v. Fed. Ins. Co., 212 F.3d 489, 491 (9th Cir.2000); the New York Court of Appeals in 175 East 74th Corp. v. Hartford Acc. & Indem. Co., 51 N.Y.2d 585, 435 N.Y.S.2d 584, 416 N.E.2d 584, 593 (1980) and the Supreme Court of Iowa in Cent. Nat'l Ins. Co., of Omaha v. Ins. Co. of N. America, 522 N.W.2d 39, 42 (Iowa 1994).
Our dissenting colleague would find Carpenter's actions to reveal a manifest intent to harm his employer because Gentilini was contractually obligated to Auto Lenders to buy back any promissory note in default. We believe this analysis glosses over the clear pecuniary benefits derived by Gentilini from the fraudulent loans and contorts the meaning of "direct loss" to make it apply to a scenario not intended by the plain wording of the contract language.
The relevant coverage language unambiguously described the insurable risk: "You may extend the insurance provided by this Coverage Form to apply to direct loss of or damage to Business Personal Property and `money' and `securities' resulting from dishonest acts committed by any of your employees ...." (emphasis added). Here, the facts involve fraudulent conduct by the employee directed against a third-party. The words "direct loss" must be afforded their plain and ordinary meaning. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595, 775 A.2d 1262 (2001). Accordingly, we decline to adopt the proximate cause analysis embodied in the Appleman's Rule. The policy involved here provides coverage to employers for losses sustained as a direct result of the illegal acts of employees, without any intervening event. To be afforded coverage, the employee's action must be directed against the employer, i.e., embezzlement, theft or destruction of business property.
In this context, payment by the insured to settle a third party claim does not constitute a direct loss triggering coverage under the policy's "Employee Dishonesty" provisions. To find coverage under these circumstances would convert this direct loss policy into a third party indemnity policy. This was not the risk the insurer agreed to cover nor the coverage purchased by the insured. "[I]n the absence of any ambiguity, courts `should not write for the insured a better policy of insurance than the one purchased.'" Gibson v. Callaghan, 158 N.J. 662, 670, 730 A.2d 1278 (1999) (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)).
Our dissenting colleague considers our conclusion that the trial court erred in construing this policy to provide indemnity coverage to be use of a mere "label [and not] accurate or useful." To describe a policy as providing indemnity coverage or liability coverage, however, is more than placing a "label" for it defines the scope of the insured risk. In the area of insurance law, the terms "third party liability" and "direct loss" are not mere labels, to be discarded when their application would frustrate a desired result. These terms have well established legal significance:
[O]ne method of classifying insurance is to categorize the subject matter by the interests protected in the insurance contract which is accomplished by asking *1074 this basic question: `To whom does the insurer's obligation to pay (indemnify) run?" Liability insurance is customarily described and classified as third-party insurance because the liability insurer's duty to pay runs not directly to the insured but directly (on the insured's behalf) to a third-party claimant who is injured by the insured's conduct. For instance, if an insured negligently injures a person not in privity of the insurance contract, that third party has a claim usually in tort against the insured. The third party's claim is not a contract claim under the liability insurance contract. But if the third party reduces its claim to a judgment (or a settlement between the insured, insurer and third party), the insured will suffer a loss. However, the insured's loss is "indirect" and the third party's loss is "direct." The liability insurer reimburses ("indemnifies") its insured for the insured's indirect loss, but payment in practical effect runs directly to the third-party claimant. The liability insurer essentially reimburses its insured for any liability it may have to the third party by paying the third party on the insured's behalf and benefit.

[1 Appleman On Insurance § 3.3 (Holmes ed.2d ed.1996).]
Furthermore, none of the cases cited by the dissent used a proximate cause analysis to transform direct loss coverage into a third party indemnity policy. The facts here do not present a facial conflict between a covered risk and an exclusion provision in the policy. We are called upon here to declare the scope of coverage contracted for by the insured under the employee dishonesty provisions of the policy. The words: "direct loss of or damage to Business Personal Property and money and securities resulting from dishonest acts committed by any of your [Gentilini's] employees ... with the manifest intent to cause you to sustain loss or damage" cannot be transformed into "damages sustained as a result of a third party liability suit brought against you by the victim of your employee's dishonesty."

III
Since we have determined that the insured cannot recover payment made to settle a third-party claim under this direct loss policy, we also vacate the trial court's award of counsel fees. Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co., 145 N.J. 345, 364, 678 A.2d 699 (1996); Giri v. Med. Inter-Insurance, 251 N.J.Super. 148, 151, 597 A.2d 561 (App.Div.1991); R. 4:42-9.

IV
The order of the Law Division granting summary judgment in favor of defendant/third-party plaintiff Gentilini Ford is reversed. We remand the matter to the Law Division for the entry of judgment in favor of third-party defendants, Ohio Casualty Group of Insurance Companies, American West Fire and Casualty Company and West American Insurance Company.
Reversed.
WECKER, J.A.D., dissenting.
I respectfully dissent. I would affirm summary judgment in favor of defendant/third-party plaintiff, Gentilini Ford, Inc. ("Gentilini"), because I agree with the motion judge that the employee dishonesty provision of the policy issued by the insurance third-party defendants (collectively "Ohio Casualty") covers Gentilini's loss.
Ohio Casualty appeals a judgment in favor of Gentilini Ford in the amount of $191,206.83, representing loss suffered as a result of the dishonest acts of Gentilini's former employee, Randy Carpenter. Carpenter submitted fraudulent credit applications *1075 to his employer and to a third party, Auto Lenders, to induce that party to finance car purchases to higher risk customers. After several of those customers defaulted on the loans, plaintiff, Auto Lenders Acceptance Corporation ("Auto Lenders"), discovered the fraud and brought suit against Gentilini to enforce the terms of the financing agreement governing these transactions.
The agreement governing Gentilini's obligation to Auto Lenders is central to my view of Gentilini's claim against Ohio Casualty. Auto Lenders, by assignment from PNC Bank, became a party to a "Retail Paper" "Dealer Agreement" with Gentilini. Under paragraph 18(b) of that agreement, in the event of any "incorrect" loan application, Gentilini was obligated "to repurchase the ... [loan] Contract, without recourse to [Auto Lenders], for an amount equal to the unpaid balance of the amount financed." Gentilini paid $215,000 to settle Auto Lenders' suit to enforce Gentilini's contractual repurchase obligation.
Gentilini brought a third-party action against its insurers under the "employee dishonesty extension" of the property insurance section of its commercial coverage insurance policy, seeking a defense to Auto Lenders' suit and indemnification. The insurers declined coverage. On cross-motions for summary judgment, the motion judge granted Gentilini's motion and denied the insurers' motion.
The relevant policy language is as follows:
Employee Dishonesty
(1) You may extend the insurance provided by this Coverage Form to apply to direct loss of or damage to Business Personal Property and "money" and "securities"[3] resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:
(a) Cause you to sustain loss or damage; and also
(b) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:
(i) Any employee; or
(ii) Any other person or organization.
* * * * * *
(3) The most we will pay under this Extension for loss or damage in any one occurrence is $5,000.
(4) All loss or damage:
(1) Caused by one or more persons[4]; or
(2) Involving a single act or series of related acts; is considered one occurrence.
The motion judge concluded that the policy issued to Gentilini covered Ford's damages as a "direct loss," citing the socalled "Appleman's rule" that where an insured risk sets in motion a series of events that lead to the final loss for which recovery is sought, the final loss is covered. The judge also ruled that each of *1076 Carpenter's twenty-seven fraudulent acts constituted a separate occurrence, allowing recovering up to the policy limit of $5,000 for each of those acts, totaling $135,000; Gentilini was entitled to recover attorneys' fees incurred in defending Auto Lenders' claims as an element of damages; and Gentilini was entitled to recover attorneys' fees on its suit against Ohio Casualty. With the exception of the award of attorneys' fees, I agree. I would therefore affirm in part and reverse in part.
I disagree with the majority's interpretation of the policy in several respects. First, I find that under the circumstances, Carpenter's conduct involved the "manifest intent" to harm, not to help Gentilini. Second, I find that the loss suffered by Gentilini as a result of Randy Carpenter's undisputed, dishonest conduct, which obligated Gentilini under the terms of its contract with Auto Lenders to repurchase the fraudulently acquired notes, is a "direct loss" resulting from an insured risk. Finally, whereas the majority holds that the motion judge erred in "construing the policy of insurance as providing indemnity coverage to Gentilini," Op. at 31, 816 A.2d at 1070, I do not find that label accurate or useful here.
There is no dispute that Gentilini suffered loss as a result of employee dishonesty. Gentilini's employee, Carpenter, repeatedly instigated the submission of fraudulent loan applications by Gentilini's customers. In each case, the customer obtained a motor vehicle from Gentilini by misrepresenting his or her creditworthiness, with Carpenter's knowledge, thereby inducing both Auto Lenders and Gentilini to approve the loan and the sale.[5] Gentilini would accept the customer's note; under the terms of Gentilini's agreement with Auto Lenders, Auto Lenders would advance cash in the face amount of the note to Gentilini; and Gentilini would assign the note to Auto Lenders. However, in the event the customer defaulted, or the loan application was "incorrect," Gentilini was obligated to repurchase the note and pay Auto Lenders the unpaid balance.
Under these circumstances, I cannot agree that Carpenter's dishonest acts, on at least twenty-seven separate occasions over a period of eleven months, were not undertaken with the "manifest intent" to harm Gentilini. The majority's suggestion that Carpenter was acting for Gentilini's benefit, presumably by helping his employer to sell cars, is untenable. I cannot see how it was to Gentilini's benefit to convey propertya motor vehiclein exchange for a note made by one who was likely to default, leaving Gentilini responsible to Auto Lenders for the unpaid balance.
An actor's intent is commonly inferred from conduct, that is, from circumstantial evidence, and rarely from direct evidence of the actor's spoken or written words. E.g., State v. Siegler, 12 N.J. 520, 524, 97 A.2d 469 (1953); Donofry v. Autotote Systems, Inc., 350 N.J.Super. 276, 291-92, 795 A.2d 260 (App.Div.2001).
The intent to injure and defraud, which is necessary to constitute a willful misapplication, does not necessarily involve any malice or ill will, but merely that general intent to injure and defraud which always arises, in contemplation of law, when one willfully or intentionally does that which is illegal and fraudulent, and which, in its necessary and natural consequences, must injure another.

[Roseville Trust Co. v. American Surety Co. of New York, 91 N.J.L. 588, 591, 103 A. 182 (E. & A.1918) (citations omitted).]
The common meaning of the adjective "manifest" includes "capable of being easily understood or recognized at once by the mind; not obscure, obvious." Webster's *1077 Third New International Dictionary (1993). Black's Law Dictionary (7th ed.1999) defines "manifest intent" with a pertinent example:
Manifest Intent. Intent that is apparent or obvious based on the available circumstantial evidence, even if direct evidence of intent is not available. For example, some fidelity bonds cover an employer's losses caused by an employee's dishonest or fraudulent acts committed with a manifest intent to cause a loss to the employer and to obtain a benefit for the employee. Establishing manifest intent sufficient to trigger coverage does not require direct evidence that the employee intended the employer's loss. Even if the employee did not actively want that result, but the result was substantially certain to follow from the employee's conduct, the requisite intent will be inferred.
The majority relies on F.D.I.C. v. Nat'l Union Fire Ins. Co., 205 F.3d 66 (2d Cir. 2000), to conclude that Carpenter did not have the required manifest intent to cause harm to Gentilini. To the contrary. After discussing cases interpreting the "manifest intent" requirement in fidelity bonds, the court said: "We conclude that [the employee's] conduct in remaining silent when the Bank chose to lend $8 million more to [a borrower the employee knew to be dishonest] was substantially certain to cause the Bank a loss." The court concluded that such conduct evidenced the required manifest intent to trigger coverage on a fidelity bond. Id. at 75.
I also conclude, contrary to the majority, that Gentilini did indeed suffer a "direct loss" as a result of Carpenter's dishonest acts. The fraudulent loan applications produced at Carpenter's direction directly implicated Gentilini's contractual obligation to Auto Lenders. That obligation required Gentilini to take back the worthless paper it had assigned to Auto Lenders and to repay the money it had received from Auto Lenders (less any sums paid by the maker of the note), that is, to undo each such negotiated transaction.
The majority views Gentilini's loss as "`damages sustained as a result of a third party liability suit brought against [it] by the victim of [its] employee's dishonesty.'" Op. at 39, 816 A.2d at 1075. Largely on that basis, the majority concludes there is no coverage. However, Gentilini's liability to Auto Lenders, which resulted in the settlement of Auto Lenders' suit against Gentilini, arose not merely out of a "third party liability suit ... by the victim," but out of an unwitting breach of contract induced by Gentilini's employee's dishonesty, and required Gentilini to disgorge the benefits of that contract.[6]
I will assume for present purposes that if Auto Lenders' right to recovery against Gentilini had arisen solely out of tort theory, and that Gentilini's claim against Ohio Casualty was a claim to indemnify it for an indirect loss suffered as a result of its tort liability to a third party, Auto Lenders, it would not be a covered loss. But Auto Lenders' claim against Gentilini was *1078 grounded first in the contract between them. Carpenter's fraudulent conduct caused Gentilini to lose its rights under that contract, including the right to retain the financed portion of twenty-seven sales. Those rights constituted property, and their loss was a "direct" rather than an "indirect" loss. Where the insured's loss can be viewed in two ways, basic principles of insurance law, instructing us to interpret coverage provisions broadly and to construe exclusions and limitations narrowly, require that we view this loss in the manner that brings it within the policy's coverage. See, e.g., Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272-74, 765 A.2d 195 (2001); Gibson v. Callaghan, 158 N.J. 662, 669-71, 730 A.2d 1278 (1999).
Because Gentilini's loss can be attributed to Auto Lenders' breach of contract claim, it is a "direct" loss proximately caused by its employee's dishonesty and is therefore within the "employee dishonesty" coverage of the policy. The majority's reliance on Lynch Prop., Inc. v. Potomac Ins. Co., 140 F.3d 622 (5th Cir.1998), for the proposition that Gentilini's loss is an indirect loss resulting from its liability to Auto Lenders and not an insured direct loss, is misplaced. Here Gentilini, the insured employer, was induced to part with property (motor vehicles) based upon false representations induced by its employee. It was also induced to accept fraudulent commercial paper and then to assign that paper to Auto Lenders, resulting in loss to Gentilini. From either perspective, this was a "direct loss."
In holding Gentilini's resulting loss not to be "direct," the majority "decline[s] to adopt the proximate cause analysis embodied in the Appleman's Rule." That "rule" is set forth in 5 John Alan Appleman, Insurance Law and Practice, § 3083 at 309-11 (1970) ("Appleman"):
Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss.
[Id. at 309.]
In the case before us, the "peril specifically insured against" was "dishonest acts committed by [an employee]." Gentilini's "final loss" followed "in an unbroken sequence and connection," and the dishonest actsthe insured perilmust be regarded as the proximate cause of the entire loss, which is therefore covered under the policy extension.
I see no basis for ignoring the proximate cause analysis of Appleman's rule, an analysis which we have applied to coverage disputes in the past. See Search EDP, Inc. v. American Home Assurance Co., 267 N.J.Super. 537, 543, 632 A.2d 286 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994); Stone v. Royal Ins. Co., 211 N.J.Super. 246, 251, 511 A.2d 717 (App.Div.1986); Franklin Packaging Co. v. California Union Ins. Co., 171 N.J.Super. 188, 191, 408 A.2d 448 (App. Div.1979), certif. denied, 84 N.J. 434, 420 A.2d 340 (1980). Section 3083 of the Appleman treatise, quoted above, addresses proximate cause in the context of "fire and related coverages." Nevertheless, we have previously adopted its approach to proximate cause in another context. Search EDP, supra, (scope of professional errors and omissions policy).
While not a conflict between policy "coverage" language and express policy "exclusions" such as existed in Search EDP, Stone, and Franklin, cited above, the conflict here appears within the policy's coverage language itself, including its definitions and limitations. The proximate cause analysis reflected in Appleman's rule, which was followed in each of these three cases, equally applies here. As Judge *1079 Pressler said in Search EDP, (citing 5 Appleman, § 3083), "[w]e fully subscribe... to the proximate-cause test for resolving facial conflicts."
Ohio Casualty argues that Gentilini did not suffer a covered loss or damage to "Business Personal Property [or] `money' [or] `securities.'" Gentilini's loss arguably involved all three. In the first instance, Gentilini was caused to convey valuable propertymotor vehicleswithout receiving its anticipated consideration.[7] To the extent that the policy terms are ambiguous, long-accepted principles of interpretation applicable to insurance contracts require us to construe this policy language against the drafter, in favor of the insured, and in accordance with the insured's reasonable expectations. See, e.g., Gibson v. Callaghan, 158 N.J. 662, 669-71, 730 A.2d 1278 (1999); Salem Group v. Oliver, 128 N.J. 1, 4, 607 A.2d 138 (1992); Owens-Illinois, Inc. v. United Ins. Co., 264 N.J.Super. 460, 486-87, 625 A.2d 1 (App. Div.1993); Hoboken Camera Center, Inc. v. Hartford Accid. & Indemnity Co., 93 N.J.Super. 484, 226 A.2d 439 (App.Div. 1967); see also 1 Holmes's Appleman on Insurance, 2d § 4.23 (1996) ("Holmes's Appleman)[8]; 2 Id. § 6.6. In Hoboken Camera, a fidelity bond case, Judge Conford cited "the well-established principle that in construing an insurance policy it is presumably the intention of the parties that in the event of loss the insured will be protected to the full extent that any fair interpretation of the contract will allow." 93 N.J.Super. at 492, 226 A.2d 439. A fair interpretation of this insurance contract protects Gentilini from this loss.
The opinion of the court of appeals in Imperial Ins., Inc., v. Employers' Liability Assur. Corp., 442 F.2d 1197 (D.C.Cir. 1970), is instructive. In that case, the court held that an employee fidelity policy covered "consequential losses" suffered by the insured, which happened to be an insurance company. Those losses took the form of liability to the plaintiff's own insureds, after the insured company's employee acted dishonestly in issuing the policies.
The policy issued to Imperial protected against "loss of money, securities and other property ... through any fraudulent or dishonest act or acts committed by any of the employees...." Id. at 1198. The court rejected the argument that only the physical loss of "money, securities and other property" was a covered loss, and not "a consequential primary loss measured by payments it made to third parties [under the insurance contracts]. Ibid. The court held "that it is not so clear consequential losses were not covered as to free the policy of ambiguity in this regard. The loss here was a depletion of Imperial's monetary assets." Id. at 1198-99. The court reasoned that any doubt as to coverage was to be resolved in favor of the insured. Id. at 1199-1200. Much the same is true here.
The coverage at issue is expressly described in the policy. It is entitled "Employee Dishonesty." That coverage is defined in the first instance as loss or damage "resulting from dishonest acts committed by any of your employees...." That plain language is highly relevant both to the reasonable expectation *1080 of the insured and to the nature of the covered "loss or damage" to "Business Personal Property and `money' and `securities'...." Such language cannot, in my view, mean that only theft of tangible property is covered, as the majority suggests. Theft is one of many forms of dishonesty, and "dishonest acts" is a more inclusive term than "theft."[9] Moreover, theft is a risk covered by the basic policy. If the Employee Dishonesty Extension were limited to theft, it would be a worthless addition to the insured's policy.
Contrary to Ohio Casualty's contention, I agree with the motion judge that the twenty-seven fraudulent transactions induced by Carpenter over a period of eleven months constitute separate occurrences, each subject to a separate $5,000 limit. The common pattern of these transactions cannot fairly be said to turn them into a single event. The cases relied upon by Ohio Casualty to claim a single occurrence are entirely inapposite. E.g., Doria v. Ins. Co. of N. Am., 210 N.J.Super. 67, 74, 509 A.2d 220 (App.Div.1986) (drowning deaths of two brothers deemed one occurrence where one had jumped in to save the other.).
Pre-judgment interest is an appropriate discretionary award in a contract action, representing loss of use of the funds otherwise due. See Ellmex Constr. Co., Inc. v. Republic Ins. Co., 202 N.J.Super. 195, 208-13, 494 A.2d 339 (App.Div.1985), certif. denied, 103 N.J. 453, 511 A.2d 639 (1986). I would affirm that award as a reasonable exercise of discretion.
In light of my conclusion that it is Gentilini's loss under its contract with Auto Lenders that supports coverage here, and not a loss arising from tort liability to Auto Lenders, I do not believe Auto Lenders is entitled to recover attorneys' fees incurred in defending Auto Lenders' claims. And under our traditional adherence to the "American rule," Gentilini is not entitled to attorneys' fees incurred in prosecuting its third-party action against Ohio Casualty. See R. 4:42-9(a)(6) and Pressler, New Jersey Court Rules, Comment 2.6 on R. 4:42-9 (2003).
I would therefore affirm the judgment respecting coverage, and remand for determination of recoverable damages consistent herewith.
NOTES
[1] A certification executed by Thomas Eidell, one of the automobile buyers who participated in Carpenter's fraudulent scheme, reflects that he paid $20,000 for a vehicle he purchased from Gentilini. Eidell paid $4,000 in cash directly to Gentilini as down payment. Thus, the amount financed by Auto Lenders was only $16,000.
[2] Auto Lenders also assigned to Gentilini the right to receive any monetary restitution paid by Carpenter as part of any criminal sentence imposed by a court.
[3] The policy defines "money" as "currency, coins, bank notes in current use and having a face value, travelers checks, register checks and money orders held for sale to the public." The policy definition of "securities" includes:" all negotiable and non-negotiable instruments or contracts representing either "money" or other property." There is no policy definition of "Business Personal Property."
[4] Obviously, any loss as a result of dishonest acts will have been caused either by one person or by more than one person. It would be unconscionable to interpret the employee dishonesty coverage literally, which would treat all losses as "one occurrence" and limit coverage under all circumstances to $5,000.
[5] There is no contention that Gentilini was aware of the misrepresentations.
[6] Count One of Auto Lenders' complaint against Gentilini set forth a cause of action for "breach of defendant's representations and warranties," entitling Auto Lenders "to require defendant to repurchase, without recourse, all outstanding Contracts purchased by plaintiff from defendant for the amount of the aggregate unpaid balance due thereunder." Count Two of the complaint set forth a cause of action in tort, for "[f]alse and fictitious employment, credit and identity information relating to defendant's customers [which] was knowingly provided by defendant and/or its agents and/or employees to plaintiff for the purpose of inducing plaintiff to purchase the Contracts to which such information related." On Count Two, Auto Lenders sought damages resulting from Gentilini's vicarious liability.
[7] If Ohio Casualty intended to exclude inventory from the definition of "Business Personal Property," it was required as the drafter of this policy to express that intention in the policy itself. It is axiomatic that the court will not rewrite the policy for the benefit of either party.
[8] The original Appleman treatise has continued to be supplemented, at least through 2002. Holmes's Appleman is a substantially reorganized and expanded treatise, whose numbered volumes and sections do not generally correspond with the original treatise.
[9] "Theft," under our Criminal Code, includes, in addition to the taking of "movable property," N.J.S.A. 2C:20-3; "theft by deception," N.J.S.A. 2C:20-4; and "theft by failure to make required disposition of property received, N.J.S.A. 2C:20-9, both of which appear to describe Carpenter's conduct.